Joseph J. Weiss et al. [1] v. Commissioner. Weiss v. Commissioner
Docket Nos. 91435, 91436, 1193-63, 1199-63, 1243-63.
United States Tax Court
T.C. Memo 1965-20; 1965 Tax Ct. Memo LEXIS 309; 24 T.C.M. (CCH) 79; T.C.M. (RIA) 65020; February 8, 1965
*309 Carl M. Siegel, New Center Bldg., Detroit, Mich., for the petitioners. Charles R. Abbott and Robert W. Siegel, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: In these consolidated cases respondent determined deficiencies for the years and in the amounts as follows: Addition to Tax
Income
1939 Code
1954 Code
Docket
Taxable
Tax
Section
Section
No.
Petitioner
Year
Deficiency
294(d)(2)
6654
91436
Aubrey Gooze and Pearl Jean Gooze
1954
$ 405.30
1955
6,578.21
$288.82
1956
3,675.63
1199-63
Aubrey Gooze and Pearl Jean Gooze
1957
7,641.40
1958
2,171.44
91435
Joseph J. Weiss
1954
$ 3,252.24
$275.93
1955
13,349.61
$275.60
1956
6,859.19
1193-63
Joseph J. Weiss
1957
9,505.38
1958
6,325.15
1243-63
Joseph J. Weiss and Frances Weiss
1959
1,460.25
1960
5,071.17
The main issue is whether petitioners are required to report a proportionate part of monthly payments received on land contracts as discount income. There are other issues in Docket No. 1199-63 as to whether the gain realized from the sale of land contracts *310 was ordinary income, and whether Aubrey Gooze was entitled to a promotion and entertainment expense in each of said years of $1,500. There is also an issue as to whether Joseph Weiss was entitled to a capital or ordinary loss in the amount of $12,230.14 in the year 1955. Findings of Fact Some of the facts have been stipulated and they will be found accordingly. Petitioners Aubrey and Pearl Jean Gooze are husband and wife. They live in Miami, Florida, but during the years 1954 through 1958 they resided in Detroit, Michigan, where they filed their joint returns with the district director of internal revenue. Joseph J. Weiss resides in Detroit and he filed his individual returns for the years 1954 through 1958 and his joint returns with his wife Frances for the years 1959 and 1960 with the district director of internal revenue at Detroit. During the years here involved and for many years prior thereto Gooze and Weiss were associated in the business of buying and selling real property on contract in Detroit, Michigan. During the year 1955 and prior thereto, Aubrey Gooze and Joseph Weiss were shareholders in five corporations known as Apex Investment Company, Bell Investment Company, *311 Eagle Investment Company, Opal Investment Company and Ruby Investment Company, which corporations were engaged in the business of selling real estate on land contract. During the year 1955, Apex Investment Company, Bell Investment Company, Eagle Investment Company, Opal Investment Company, and Ruby Investment Company were dissolved, and the land contracts held by each corporation were distributed in kind to their respective shareholders. Upon receipt of the land contracts from the dissolved corporations, Aubrey Gooze and Joseph Weiss obtained appraisals from the River Rouge Savings Bank, River Rouge, Michigan, of the fair market value of each of the land contracts received in liquidation. A controversy between petitioners and respondent as to the fair market value of the properties received in dissolution of the corporations was resolved by agreement that the appraisals by the River Rouge Savings Bank, River Rouge, Michigan, submitted by petitioners should be increased 10 percent and that such increased amounts (each being less than face) were the fair market values, and, accordingly, the bases to petitioners of the land contracts received on dissolution of the corporations. *312 Weiss received 48 land contracts in 1955 upon the dissolution of the above corporations which called for payment in the aggregate sum in the face amount of $365,599.83 and which at the time of dissolution were of the agreed fair market value of $195,920. Gooze received 48 land contracts in 1955 upon the dissolution of the above corporations in the face amount of $345,870.87 and which at the time of dissolution were of the agreed total fair market value of $175,340. [2]
The land contracts received by Gooze and Weiss were what are called second contracts which were usually not notarized and not recorded. This means the corporations were contract purchasers from the legal title owners and contract sellers for a greater amount (sometimes 40 to 50 percent greater) than the first contract. Both contracts would usually involve small down payments with the monthly payments on the second being usually a little higher than the monthly payments on the first. *313 Gooze and Weiss had to keep up the payments on the corporations' vendee contracts they received in order to avoid forfeiture and generally had to secure and pay for the insurance and pay taxes, though the contracts they received when they sold the property provided insurance and taxes were the obligation of the purchasers. The homes covered by the contracts were frame houses, generally without basements, heated by stoves, some without bath tubs and generally in poor condition and all located in slum and distressed areas. In the event of default vendors could foreclose the land contracts in equity and secure a money judgment for any deficiency or they could forego a deficiency judgment and sue for quick relief in the nature of repossession before a court commissioner. Gooze and Weiss did not sue any defaulting vendees for deficiency. They did have the following number of repossessions of land under defaulting contracts in the years indicated: Repossessions
Year
Gooze
Weiss
1955
4
2
1956
3
6
1957
7
4
1958
4
12
1959
4
4
1960
4
Total
22
32
Some of the properties were repossessed by Gooze and Weiss, then sold on new contract and repossessed *314 and sold again. Thus Gooze's 22 repossessions involved 13 houses and Weiss' 32 repossessions involved 23 houses. Out of the 48 contracts Gooze and Weiss each received, Gooze abandoned 13 and Weiss 4. In their income tax returns for the years in issue Gooze and Weiss properly reported interest received on land contract payments but no part of the balance of the payments received was reported as income - said balance being treated as recovery of cost up to the amount of the agreed fair market value at the time of acquisition. An analysis of the payment experience with respect to the contracts held by Gooze shows the percent of payments made as compared to payments required to be made under the contracts in the years 1955, 1956, 1957, 1958 and 1959 to be 92 percent, 88 percent, 87 percent, 69 percent and 85 percent, respectively. An analysis of the payment experience with respect to the contracts held by Weiss shows the percent of payments made as compared to payments required to be made under the contracts in the years 1955, 1956, 1957, 1958, 1959 and 1960 to be 97 percent, 88 percent, 88 percent, 68 percent, 63 percent and 64 percent, respectively. Respondent determined a proportionate *315 amount of each monthly payment represented discount income realized by Gooze and Weiss in the years and amounts as follows: Year
Gooze
Weiss
1955
$4,834.17
$ 5,539.74
1956
8,257.98
8,714.81
1957
7,523.26
8,887.03
1958
4,698.06
8,784.74
1959
6,242.12
1960
13,753.99
On August 2, 1954, Joseph Weiss entered into a written agreement with Samuel Schwartz, Harold Keshner, and Martin Weiss (brother of Joseph Weiss) for the purpose of establishing a surplus merchandise business for the wholesale and retail marketing of surplus merchandise. Pursuant to the agreement, Joseph Weiss advanced $25,000 and he was to receive one-half of the profits of the business. The agreement provided that Joseph Weiss should have a first lien upon the assets of the wholesale and retail surplus merchandise enterprise up to the sum of $25,000 and that Joseph Weiss should have the absolute discretion as to the management of the said enterprise. Paragraph 8 of the agreement provides as follows: "That the said joint adventure shall include all of the business hereafter transacted by the above-named individuals and any other corporations or partnerships hereafter formed by *316 said parties for the carrying on of a retail surplus business." On August 26, 1954, Articles of Incorporation for Motor City Surplus, Inc., 10807 Lyndon, Detroit 21, Michigan, were filed with the Michigan Corporation and Securities Commission. The purpose of the said corporation, as set forth in its Articles of Incorporation, was to, inter alia, buy and sell wholesale and retail surplus merchandise. The resident agent of the corporation, as set forth in the Articles of Incorporation, was Martin Weiss, who was also elected the corporation's treasurer at its first meeting. On liquidation of Motor City Surplus, Inc., Joseph Weiss received $12,769.86 of its assets which he credited to the loan of $25,000. On his 1955 income tax return Weiss claimed the amount of $12,230.14 as a "Loss on investment" which he deducted as an ordinary loss. Respondent disallowed the loss as an ordinary loss but deducted it in full as a capital loss. During the years 1957 and 1958 Gooze sold some land contract equities to A. A. Lauppe at a profit and showed the following gain which he treated as long-term capital gain: 1957
$12,446.43
1958
3,873.83 Respondent determined Gooze held *317 the land contracts for sale to customers in the ordinary course of his business and therefore the gain as adjusted by him on the sale of said contracts constituted ordinary gain in said years. Gooze deducted $1,500 in 1957 and $1,500 in 1958 as "Entertainment & Business Promotion." Respondent disallowed the claimed deduction in each of said years for lack of substantiation. In 1960 Weiss took an ordinary loss deduction for a loss sustained in the sale of unimproved Florida real estate. Respondent disallowed the loss as an ordinary loss but allowed it as a capital loss. Opinion Where obligations that are payable in installments with interest are purchased at less than face, the installment payments the purchaser receives represent proportionate amounts of interest, return of cost of investment, and taxable gain. , affirming , and cases cited in both opinions. Under certain circumstances where it is shown the obligations purchased were speculative, it has been held the purchaser or investor could recover his full cost first before reporting any amounts received in payment as realized discount *318 income. , affirming ; , reversing Memorandum Opinion of this Court on the factual conclusion that the contracts were speculative, and . The central issue here that is common to both the Weiss and Gooze Dockets is whether those petitioners can defer reporting any discount income with respect to each contract received as liquidation distribution from their corporations until after they have recovered all of their stipulated basis with respect to such contract. In his two page argument on this issue, Gooze says the question has been answered in the above cited cases. He attempts to distinguish Darby, which involved a purchase of Michigan land contracts at less than face, and this Court and the Court of Appeals, Sixth Circuit, both held the discount income could not be deferred, and he argues the other three cases where it was held the purchasers of the contracts could defer the discount income because the contracts were speculative are like the situation present here. [3]
*319 There is one obvious difference in the instant cases and those cited which is not mentioned in any of the filed briefs. Neither Weiss nor Gooze were actually purchasers of the land contracts. It cannot be said that they were investors in this land contract market which the parties stipulate exists in Michigan. It is stipulated here that each of the corporations that distributed the contracts in question to Weiss and Gooze, had allocated for accounting and income tax purposes, each monthly payment received by said corporations on said land contracts among: (a) interest, (b) recovery of cost (or other basis) and (c) gain. The corporations could not defer any gain until they had recovered costs on any theory that the contracts were speculative. See We see no reason why their distributees who make no purchase of or investment in the contracts can defer gain until after recovery of cost on the theory the contracts were speculative. The cases cited by Weiss and Gooze involve situations where the taxpayers purchased the contracts and it was held, in all but Darby, that the contracts were so speculative that they were entitled to recover costs before *320 reporting a reasonably uncertain profit. Even if it be thought the rule permitting costrecovery method of reporting where contracts are speculative, would have some application even though the taxpayer acquires his contracts in a liquidation distribution, it would not be applicable under other special facts and circumstances in this case. Gooze was asked by his attorney to give an example of how the corporations operated. Gooze used as an example a house that could be bought for $3,000 cash. He said the corporation would have some financial backer buy the house for cash for $3,000 and then the corporation would immediately buy the house from the cash purchaser on a contract for $4,000 with $500 down payment and the balance, or $3,500, in monthly payments. The corporation would then sell the house on a monthly payment contract to a vendee for around $7,000 with anything from $50 to $500 as a down payment. Gooze stressed the fact that in this typical transaction the corporation emerged with a land contract receivable for $7,000 for the purchase of a house that was bought for $3,000 cash. He said the vendees they negotiated with were only concerned with getting a place to live with *321 as small a down payment and as small monthly payments as they could get. It was his testimony that 90 percent of the vendees were not interested in the purchase price recited in the contract. He said: "It was the down payment or the monthly payment that was important." He went on to say that under the contracts it was the obligation of the vendees to take out insurance and pay the taxes on the property. He said none of them took out insurance on the property they bought and he stated: "I would say that 75 percent that bought these properties did not pay the taxes." The corporations had to make arrangements for payment of delinquent taxes and they insured the properties in the amount of the original cash price - $3,000 in the example given. Gooze testified the corporations were satisfied if the vendees just made the monthly payments. Weiss and Gooze urge the speculative character of the contracts is shown by the large discounts from face - as much as 48 percent in some instances. It has been held that a large discount from face is some indication that a contract purchased by an investor is speculative. Under the liquidation distribution involved here, discount from face means the *322 spread between fair market value of the contract in the hands of the distributee and the purchase price recited therein. The fact that the spread is great here results from the corporations putting an unrealistic purchase price in the contracts. Gooze and Weiss knew it was unrealistic. Under the facts here the "discount from face" is not an indication that the contracts were speculative. Weiss and Gooze also argue that the evidence showing the properties covered by the contracts were (1) in poor condition, (2) located in slum areas, and (3) the vendees were in a low income group, show that the contracts were speculative. The contracts are not rendered speculative by these factors. Presumably the character of the properties, their slum locations and financial irresponsibility of the purchasers, were factors that led to the large discount from face in fixing low market values of the contracts. But the presence of such factors does not indicate Weiss and Gooze were running any great risk of loss. These factors would do no more than indicate Weiss and Gooze might not collect the full amount of the inflated purchase price stated in the contracts or about 48 percent profit. We have *323 set forth in our findings of fact the payment records under the contracts after they were distributed to Weiss and Gooze. They show that the collections were surprisingly good considering the inflated nature of the contracts and all of the factors such as the sub-standard character of the houses, their slum location, and the poor class of vendees. At least it cannot be concluded from such figures that the risk of loss was great or that the contracts in their entirety were speculative. These contracts were not speculative in the hand of Weiss and Gooze. It cannot be said that they had made a venture in which the hope of high profits was offset by a high degree of risk or loss. This record shows nothing more than a possibility of high profits because of an unrealistic purchase price with no great risk of loss. We hold Weiss and Gooze were not justified in reporting their income from the contracts on a cost recovery basis. They do not question respondent's determination if a part of the payments received under each contract is to be allocated to discount income. We uphold respondent's determinations as to discount income received by Weiss and Gooze in the years in question. During *324 1957 Gooze sold 11 land contracts and reported a gain of $12,446.43 on said sales and during 1958 Gooze sold 4 contracts and reported a gain of $3,873.83 on said sales. He reported these gains in said years as long term capital gains. Respondent determined Gooze held the contracts for sale in 1957 and 1958 in the ordinary course of his business and determined the gain he realized constituted ordinary income. The sales were all made to a wealthy doctor named A. A. Lauppe with whom Gooze was closely associated in a business and social way. Gooze held a power of attorney on Lauppe's checking account and Lauppe frequently aided Gooze when cash was needed in his land contract business by loaning Gooze money or purchasing some of his contracts. We hold for Gooze on the issue - that he was not holding land contracts for sale in the regular course of his business and the gains on contract sales in 1957 and 1958 as adjusted by respondent were long term capital gains. Gooze deducted $1,500 in each of the years 1957 and 1958 as entertainment and promotion expenses. Respondent disallowed the claimed deductions and the only substantiation Gooze offered was his vague testimony of amounts he *325 expended for providing vacation, travel, and meal expenses for Lauppe and for maintaining Lauppe as his house guest in Florida and for a used automobile he turned over to Lauppe. Not only is there a lack of any documentary evidence to substantiate the payments but there is also a failure to show the payments if made would constitute business entertainment and promotion expense. [4] We hold for respondent on the issue. In his 1955 return Weiss claimed the amount of $12,230.14 as a "Loss on investment", which he deducted as an ordinary loss. This loss was in connection with Motor City Surplus, Inc., a Michigan corporation. Respondent disallowed the loss as an ordinary loss but allowed it as a capital loss. In 1954 Weiss entered into an agreement with three other parties for engaging in the business of buying and selling surplus properties. The other three were to do the buying and selling but Weiss was to put $25,000 into the business and get one-half of *326 the profits. It was Weiss' testimony that three weeks after the agreement was executed the other three, without his knowledge, organized a corporation called Motor City Surplus, Inc. and carried on the business as a corporation with his $25,000 capital. The business failed in 1955 and the other three turned over all of the remaining corporate assets to Weiss and he recovered all but $12,230.14 of his original $25,000 investment from said assets. It seems incredible that Weiss did not know of the formation of the corporation. The agreement he signed contemplated the formation of a corporation to carry on the business. One of the other three parties was Weiss' brother. Weiss said he saw his brother weekly and that he went out to the plant where the business was being carried on at least once a month. In any event, petitioner's position is not aided by his testimony that he was surprised when he learned the business was carried on in corporate form. The fact still remains he merely made a $25,000 capital investment in the business of Motor City Surplus, Inc. and the ultimate loss of a portion of the investment was a capital loss. Weiss took an ordinary loss deduction on a loss sustained *327 in 1960 on the sale of unimproved real estate in Florida in the amount of $3,648. Respondent disallowed the loss as an ordinary deduction but allowed the loss as a capital loss deduction. Respondent argues that there is no evidence that Weiss was in the business of buying and selling real estate in Florida in 1960. In his requested findings of fact respondent asks us to find that Weiss has been in the business of buying and selling real estate for 35 years. The request is based on Weiss' own testimony to that effect. While Weiss did not specifically say he had been engaged in the business of buying and selling Florida properties in 1960, he also did not specifically say the situs of his real estate business was Michigan. In his petition he alleges there were no geographical limitations to his real estate business. We feel his testimony of long time engagement in the business of buying and selling real estate, which respondent admits should be accepted, is sufficient to make out a prima facie case of business loss on the Florida real estate sale. We hold for Weiss on the issue. Weiss concedes that a bad debt, that he took as a deduction in 1954 involving a $3,000 debt owed to him *328 by a party named Kotzen, probably did not become worthless before 1958. Respondent's disallowance of the deduction is sustained. Weiss' attorney mentioned two other items in respondent's determinations of deficiencies that he was contesting. One was disallowance of $1,124.41 deducted as interest on 1955 return and the other was disallowance of $1,500, $1,500, $1,609.24 and $600 claimed on his 1957, 1958, 1959 and 1960 income tax returns as entertainment and promotion expenses. No evidence was introduced with respect to these items so they must be deemed abandoned. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: Aubrey Gooze and Pearl Jean Gooze, Docket Nos. 91436 and 1199-63 and Joseph J. Weiss and Frances Weiss, Docket No. 1243-63.↩
2. These figures are taken from respondent's brief and are slightly less than the figures set forth in the computations in the deficiency notices sent to Gooze. We assume the difference reflects agreed computation adjustments.↩
3. Weiss, in his brief, gives no argument at all on this issue. He merely states "See Gooze brief for basic argument" and he adds a few lines to the effect that the high discount (nearly 48 percent of face) demonstrates the speculative character of the contracts.↩
4. Gooze admitted that in 1963 he filed a claim in the Estate of A. A. Lauppe, Deceased, for $13,595.43 based on loans and advancements to Lauppe over a period of years for items including an automobile, vacation and lodging.↩